Case No. 15-1323, et al., El Paso Natural Gas Company, LLC, Petitioner v. Federal Energy Regulatory Commission Mr. Nelson, Petitioner, El Paso Natural Gas Code Ms. Texella and Ms. Berry for Respondent FERC And Mr. Bress for Petitioner, Southern California Gas Company, et al. Thank you. May it please the Court. My name is Howard Nelson, and I represent one of the petitioners in this case, El Paso Natural Gas Company. We have challenged three rulings, and he orders them to review, and I will address each one in turn. With respect to capital structure, El Paso's total capitalization exceeds the amounts of assets in its regulated rate base. It is not disputed, though, that El Paso does not earn a return on the non-rate base assets that are associated with this excess capitalization. The issue in this case is whether inclusion of some of that excess capitalization in El Paso's capital structure that is used to calculate a return on its investment in rate base distorts that capital structure. It is our position that the Commission's requirement that El Paso remove two of those non-rate base assets, a loan and undistributed subsidiary earnings, solely from the equity component of El Paso's capital structure, violates a line of cases that has its genesis in a 1971 Fifth Circuit opinion, also in an El Paso proceeding, where the Court held that it is only if the source of funding of a non-rate base asset can be distinctly identified and surely isolated, or in the words of future Commission cases, traced to equity, that it is appropriate to remove a non-rate base asset from equity. Can I ask you a question, just a framing question, which is the way you've described it is it's in conflict with precedents. Just assume hypothetically for the minute that there is no precedent. Is it wrong to exclude these assets from equity in an effort to as accurately as possible capture the debt-equity ratio? Well, the capitalization should as closely as possible represent the equity underlying rate base. But the existence of these non-rate base assets does not distort the capital structure. There is no reason to believe that just simply including those assets in capitalization distorts capital structure. The decision is based on the common sense rationale that if the source of funding for the non-rate base asset is not traced to equity, then total capitalization should not affect capital structure. It's only if the source of funding of the non-rate base asset changes the debt-equity mix underlying rate base that the capital structure is distorted. Right. So that's the basis of the holding in El Paso. But without that holding, that logic still applies. So in this case, FERC concedes that logic. It says it has to show there's a change in the mix. It concedes that it has to attribute an asset to equity to remove that asset to equity because it wouldn't change the capital structure. In fact, in the rehearing order in 517A, the commission allowed $50 million of that loan balance to be removed from debt because it was traced to a debt issuance. So putting aside the commission's arbitrary distinction between attributing an asset to equity, which it concedes it must do, and tracing the asset to equity, which it claims it doesn't have to do, the commission hasn't done either. It's undisputed that both the loan balance and the subsidiary earnings were generated from revenues derived from operations. Once derived, they become commingled into El Paso's finances and, in the words of the Fifth Circuit, become part of the corporate hodgepodge. So what is the commission's rationale then? It says, okay, because those two non-rate-based assets are not devoted to or available for investment in rate base, they must be removed. Well, that standard has no bearing. Whether that is so has no bearing on whether or not the capital structure is distorted. It may relate to whether the asset should be in rate base, and they're not in rate base. So it also proves too much that there are a number of assets, typically in a pipeline balance sheet as well as El Paso's balance sheet, that are not in rate base and are not available for investment in rate base. The obvious example is the subsidiary itself, which is an asset on El Paso's balance sheet. And the commission has not stated that that has to come out of equity. They concede that in a number of cases they found that it doesn't have to come out of equity because it wasn't traced to equity, not whether it's available for investment in rate base or not. The commission relies heavily on the district gas case, a First Circuit opinion. But that case was decided on very narrow grounds. In that case, the ALJ did find that a $6.5 million loan should be removed from equity because it was not available for investment in rate base. The commission affirmed that decision, the ALJ's decision, without discussion. But by the time it got to the First Circuit, the parties had agreed that the issue to be decided by that court was whether or not the loan was available for investment in rate base, which in turn depended on whether the parent or the pipeline subsidiary controlled whether the loan would be repaid. And the court said the parent controlled that and affirmed the commission. But in that case, the court was given the standard by the parties. It was told what it had to decide. It didn't comment on that rationale and also didn't address the requirement in the El Paso Fifth Circuit case that to remove an asset from equity, it had to be distinctly identified and surely isolated to equity. The commission's rationale or its interpretation of district gas is also inconsistent with its arguments in this case. At page 33 of its brief, it cites district gas for the proposition that since the loan was derived by revenues, which cannot be traced or attributed to either debt or equity, it should be removed from equity. Yet in this case, the commission concedes you have to trace a non-rate base asset to equity. And it must concede that because that's what El Paso requires and that's what a rational standard requires. The commission's subsequent cases after district gas also don't apply that rationale. There are a number of commission cases in which the commission has refused to remove a non-rate base asset, including specifically loans from equity because they were not traced to equity. The Mountain of Fuel case, the commission expressly stated they denied a request to remove a loan balance from equity because there was no evidence in the record to show that it was traced to equity. In the Transco line of cases, which is the Opinion 414 line of cases, the commission also refused to remove a loan from equity. And in that case, it was because of a new policy that was announced in that case concerning capital structure, where the commission decided that it was no longer going to look behind the reason that a parent established a particular capital structure for its pipeline subsidiary as long as the resulting equity ratio was within a reasonable range. And I would suggest to you that if it would have been okay for El Paso's parent in this case to intentionally create a 60% equity ratio by either infusing equity or retiring debt, under Transco, that would have been reasonable because a 60% equity ratio is within an acceptable range. Perhaps the commission made that finding. Yet if that loan balance results from an accumulation in a cash management program that was approved by FERC, somehow that's not appropriate. Can I ask you this, not on the loan, but on the unrealized subsidiary earnings? So the commission at paragraph 97 of the Joint Appendix J44 to 45 says the following. Instead, as our accounting reflects, the undistributed subsidiary earnings represent unrealized equity in the subsidiary generated from pipeline operations. When that equity is, in fact, appropriated by the parent, it will be recognized in an account as retained earnings or equity. So it's tying the unrealized subsidiary earnings to equity as distinguished from debt. Because I understand your point that there needs to be some basis for deciding to assign it to equity as opposed to debt. Otherwise, you could apply the same debt equity ratio that exists already. So you have to have some basis. But isn't that a basis? Well, no, Your Honor. Let me use this as an example. The commission's policy, as it's expressed in the United case, which is involving undistributed subsidiary earnings, is that if it's undistributed, it's not available for investment. If it's distributed, then it should be included in equity. But if it's distributed, it just goes from one equity account to another equity account. And so it doesn't matter where it is. The issue is how it's sourced. Because that's what determines whether capital structure is distorted. And I would point out another inconsistency between the two issues here. The commission states that with respect to the loan, that once revenues are earned from operations, that that's not attributable to debt or equity. But it should be removed because now the pipeline, at its discretion, has disposed of those revenues as it wants. Yet when you get to subsidiary earnings, once it moves from undistributed to distributed, they have that cash. They can distribute it at its discretion, the pipeline. In fact, the pipeline could provide it to its parent. So whether it's available for investment or equity doesn't matter. It's also available to distribute. Either case, it's not used for jurisdictional purposes, and it's not in rate base. And either case, it doesn't distort capital structure. I would turn to Article 11.2B. I have four and a half minutes. Article 11.2B of the 1996 settlement prohibits El Paso from recovering in its future rates the cost of unsubscribed or discounted capacity that existed on the system at that time from a discrete set of shippers at that time. When El Paso filed its 2011 rate case, the issue the commission was presented with was whether El Paso's current rates, the rates filed in that rate case, included a shift in the cost of discounted 1995 capacity when the capacity was much larger than it was in 1995. The principal problem with the commission's resolution of that issue is having remanded the cost shift issue to another hearing because it needed evidence to resolve it. The commission then rejected the evidence that El Paso supplied at the hearing and made a finding without the evidence that it said it needed. So the commission's examination of 11.2 first started with a presumption that was designed to determine whether or not there was discounted 1995 capacity. The commission found that the capacity of the system in 1995 was approximately 4,000 MMCF. So the commission said, if El Paso can show that its current contracts, that it had current contracts priced at the Article 11.2A rate or higher, which was the maximum rate in 1995, for the full 4,000 MMCF, it would presume there was no discounted 1995 capacity. So we get to this case in 2011. In Opinion 528, the commission finds that El Paso did not meet the presumption. But it said, a record's not sufficient to determine whether or not there's a shift in the cost of that 1995 capacity. If it doesn't meet the presumption, that means there's 1995 discounted capacity. So the commission said, El Paso, at the hearing, you can show compliance with Article 11.2B if you show that the total amount of discounted revenues ensure that there's no cost shift. Then in the Orders Under Review, after the hearing, the commission affirmed the ALJ's striking of El Paso's cost of revenue evidence, her rejection of the second cost of revenue evidence,  was greater than the post-1995 capacity, there must be some discounted 1995 capacity, and therefore, there must be a cost shift. Well, essentially, the decision says, because you didn't meet the presumption, there's existing discounted capacity, 1995 capacity, there must be a cost shift. If that were the case, why have a hearing? If the evidence that El Paso submitted to show that the revenues exceed the cost of 1995 capacity was inappropriate, because in the commission's view, you can't separate 1995 costs from post-1995 costs, then what did the commission mean by the evidence that El Paso must show? What evidence could it have shown? The reason that a failure to meet a presumption, that presumption does not indicate a cost shift, is because the presumption measures discounts by comparing El Paso's current contractual rates to the Article 11.2a rate, which was the maximum rate, based on a rough measure of 95 costs. But the issue in this case is whether there's a cost shift of that discounted 95 capacity in El Paso's current rates. And the current rates, the cost of El Paso's 95 capacity in El Paso's current rates, in the 2001 rate case, is much lower because the system has depreciated over the last 16 years. I'd like to give you an example. Suppose that the cost of El Paso's capacity in 1995 was $100 million, and there was therefore a unit rate of $1. Now we get to the 2011 rate case, and El Paso has a contract priced at $0.90. That $0.90 compared to the 11.2a rate in 1995 of $1 is discounted by a dime. But now assume that because of depreciation, the cost of the 95 system, which is the facilities that make up that system, is now $50 million. And therefore there's that $0.50 unit rate. But while the $0.90 contract is discounted compared to the 11.2a rate, it's more than sufficient to cover the cost of that $0.50 contract, and therefore there is no cost shift. I see there's 10 seconds left. Anybody have any questions? We'll give you some time for rebuttal. Thank you. Good morning, Your Honors. Beth Pasella for the Commission. I'll start with the 11.2b issue, because that's where we ended up. It seems that El Paso is arguing that there was no evidence shown regarding there being an actual cost shift, but that's not true. If you look at the trial staff analysis, it was specifically shown that it wasn't just that... What that analysis showed was that El Paso used lower-than-presumption billing determinants to set its compliance filing rates due to discount adjustments or unsubscribed capacity. And it further showed that using lower-than-presumption billing determinant levels increased maximum rate Article 11.2b shipper rates. So it wasn't just that there were these billing determinant issues, but that it actually increased the rates. So it was shown that there was an improper shift. What's the site for that? The site is Opinion 528B, JA 520, Paragraph 50, and also in the trial staff initial brief at JA 1048, and in also JA 1041-42, and JA 1126-27 is where all of that evidence is. And it showed that the rates would shift, and again, if you look at the initial order on remand, JA 1086-87, Paragraphs 113 and 115, and 528B, 520-21, Paragraph 40, and Paragraph 50-52, and 528A, JA 455, Paragraph 380. The same thing was true for the rate-protected shippers analysis. In that case, it did talk about the fact that, according to El Paso's data, it discounted more than 1 million decatherms per day of capacity. Its total discounted capacity was 1.5 million decatherms per day. And the claimed capacity post-1995 capacity was only half a million decatherms, so it showed that it discounted capacity of more than 1,000 decatherms per day. It also showed that the rate proposal allocated, again, this is the key point, the rate proposal allocated these discounts to all shippers that pay El Paso's maximum rates, including 112B shippers, and that's how you know that there's an improper cost shift. And the sites for that are, in the orders, are 528B, JA 514, Paragraph 40, JA 520, Paragraph 50, 528A, Paragraph 380, JA 455-56. In the initial order on remand, JA 1086-87, Paragraphs 114-115. The other issue that El Paso talked about regarding 112B was the depreciation claim and the 112A rates. And that was only the rate-protected shippers used for their analysis, 112A rates, so it wouldn't apply to the trial staff analysis as well, but regarding the rate-protected shipper analysis. What the commission explained about that is at JA 520, Paragraph 51, and 528B. The commission said there, while El Paso wants a comparison between the cost of 95 capacity in its current rates and those embedded in the 112A rates, El Paso has failed to provide adequate information to permit a computation of the cost of 95 capacity in its current rates. Because El Paso operates an integrated system, its capacity, its cost of service, and its associated costs and revenues are based on both 95 and post-95 capacity. So it wasn't that it couldn't be done on the information that El Paso provided in the record here regarding its own rates. I'll turn to capital structure now if there are no 112B questions. Thank you. Let me start off where El Paso did, and that's start off with distortion, the distortion question. Regarding the loan, the commission found that there was a distortion here because El Paso made a long-term return of capital through the loan to its shareholding parent, which offset the amount of capital its parent has at risk in the pipeline, which is the basis on which El Paso, the parent, earns a return. And that's at 517AJA150-52, paragraphs 43 and 46, 517JA48, paragraph 106, and 528BJA536, paragraph 79. The commission explained elsewhere that absent the adjustment, the equity figure isn't representative of the amount that El Paso, the parent has in state in El Paso, so it doesn't represent the risks, and that was the commission's point there. I can talk about, if you have any questions, about why the loan and the undistributed subsidiary earnings were taken out of capital structure at all, or I could just skip right to why it was taken out of equity. I'm going for equity. Oh, of course. That's what I thought. I didn't want to skip that in case you had questions. So, why it's out of equity. So, the loan first. The commission explains... The commission explains, first of all, that it's required by longstanding precedent in Southern California Edison, Indiana, Michigan, the equity accounting rule, and Arkla Gas. It was all taken out of equity. The loan was all taken out of equity. But on top of that, the commission... Oh, I'm sorry. That's undistributed subsidiary earnings. So, I'm on that already, and I'll stay there. The undistributed subsidiary earnings. All of those cases are those. And the second reason is that it's accounted for in FERC account 216.1, which is a proprietary capital equity account. So, these funds are surely, distinctly identified and surely isolated in FERC account 216.1, which is an equity account. And that's where? Is that... Where is that in the joint appendix? In the orders? Yeah. Yes, that's 528B, JA 535, paragraph 78. 517, JA 39, paragraph 86. And JA 44, paragraph 96. The equity in 517, JA 143, paragraph 27, note 39, and 527, JA 27, paragraph 61, the commission explains that in the equity accounting rule, it explains that undistributed earnings are booked to account 216, which is a stockholder's equity account under the commission's uniform system. So, that's why it's out of... Why it's deducted out of equity. Also, the commission explained why the undistributed subsidiary earnings are not debt. The commission explained that taking on additional debt wouldn't be anticipated to result in subsidiary earnings, as any funds obtained as proceeds would be offset by an equal liability. And El Paso also failed to show that undistributed subsidiary earnings arose from a debt issuance at all. So, that's why it's out of... That's why that's out of equity. The loan is out of equity because... The funds originated from internally generated funds, which El Paso agrees with, and El Paso had no debt or preferred stock issuances in the relevant time frame. And that's the relevant holding from District Ass. In District Ass, where the facts mirror what happened here, there was a loan to a parent company that was excluded from equity because of those exact reasons. In Southern Natural as well, the commission did the same thing. The commission explained that once earned, these internally generated funds were equity, available to the pipeline to dispose of at its discretion.  And that was their choice, but it doesn't make it not equity just because... Did a portion of the loan, though, get attributed to debt? I'm sorry? Did some portion of the loan get attributed to debt? Yes. And why is that? That was because El Paso did show a 2007 debt issuance of $50,000, $50 million, excuse me, and the commission gave them the benefit of the doubt that there was something to hang the hat on to say that it was debt. So they're not sure that that's what it was, but there was something, some basis to attribute it to debt. Not to trace it to debt, but to attribute it to debt. And so the commission took the... It was $615 million, and it went down to $565 million because of that debt issuance. Are you distinguishing between attribution and tracing because you don't believe that the burden is on the commission to trace? No, I think it's because these types of items are not generally given based on debt or equity issuances. So it would be futile to try to trace them generally to debt. You're not going to take out, as the commission explained, you're not going to take out a loan, you're not going to issue debt to give your parent a loan. Why would someone do that? And with the undistributed subsidiary earnings, those are earnings. They're not going to be traced to a debt or equity issuance. So it's just futile to do so. But you do have to attribute it. There has to be some basis to attribute it to equity or debt in order to take it out of that side. I want to mention that El Paso continues to argue that in the transfer proceedings, there was a loan during the test period, the rate test period, that had not been paid back by the parent. And that's just not true. And the commission explained that. The commission even said in its orders, El Paso keeps saying that the loan wasn't paid back, but the loan was paid back. So a transfer does not involve a loan to a parent. And the commission explains that at 517A at JA175, paragraph 111, and 528B at JA533 to 34, paragraph 76. I can talk about the final thing would be Mountain Fuel. Can I just ask you on the parent loan again? So it sounds like you're saying that just as a general matter, you wouldn't expect El Paso to issue debt to give the parent a loan. That's right. But then with the $50 million, that is what happened. Well, the commission didn't find for sure that that was. It just said there is a basis on which to attribute it. There was an unaccounted for, I guess. And I'm sorry, I don't really understand more about that because the record doesn't explain more about that. But they said, hey, we have this $50 million debt issuance in 2007. You can attribute it to that. And the commission erred on the side of giving them. Because, again, the commission doesn't just want to take things out of equity if it's not appropriate to take things out of equity. So it did have something to, I guess, trace it to. But tracing didn't mean we know that this debt financed, paid for that loan. Did that instrument say the purpose of the loan was so that the subsidiary could contribute it, could loan it to the parent? My understanding is no. And let me see if I can find that. My understanding is when El Paso presented it to the commission, it wasn't like we know for sure that this is what the $50 million towards the loan. We just have this $50 million debt issuance. And, again, the commission erred on the side. And I'm sorry it would take me some time. I could find the site for that and explain that. Let me see if I can do that quickly. It's okay. All right. But it is in there. And I don't think that El Paso would disagree with that. Maybe they will. And then I can always send the court the sign there. If there's no further questions. Thank you very much. Thank you. We'll give you two minutes for rebuttal. Can I just ask about that? Did the debt instrument by which money was loaned to El Paso say we're going to take this money and send it to the parent? No. Because no one would loan under those circumstances. Right. It was just a question of tracing. Well, but I don't understand the tracing. If the people who are loaning the money don't understand that it's being transferred somewhere else, then they think it's in El Paso and not being sent up to a parent. Right. Well, our position is that these revenues and the loan balance can't be traced at all. I beg your pardon? I'm sorry. Our position in the case was that the loan balance, the revenues that generated that loan balance can't be traced at all because it's commingled in El Paso's finances. But the commission, in its initial order, said, you know, I'm going to take it out of equity. It seems like they did you a favor they didn't have to do you. That's what I'm wondering about this. Well, we would say that the entire thing should not have been taken out of equity. I know you would say that, but I think you get a benefit here. You shouldn't be second-guessing because it seems like the right answer was not to do that. I agree. If you buy their logic, which I think is flawed, then that's why the loan balance, that's why the debt came out. We don't agree with that logic, but if that was their logic, we said in the alternative, if you're going to apply that logic, you've got to at least take out the $50 million from the debt. So let me respond to a few things counsel stated. You know, she says that, you know, that what they did is they didn't trace the equity, but they attributed it to equity because it affected the risk of the companies. Well, and it lowered, you know, it offsets the parents' stake in the business. Well, El Paso's parents' risks are not an issue in this case. Whatever their risks are, it doesn't affect whether the capital structure is distorted or not, which is the issue. With respect to subsidiary earnings, again, you know, she's cited to where it shows that it's in an equity account. I don't refer you to Paragraph 61JA2728 and Paragraph 97, Paragraphs 44 to 45, where it shows it just moves from one equity account to another equity account. So the commission's distinction of whether it's available or not available really has no bearing here. With respect to the Transco case, counsel says that there was evidence that the loan was repaid. There was a mention, an allegation of whether it was repaid. The commission didn't resolve that issue, and that wasn't the reason why it refused to remove it from equity. The reason was we're not going to look behind the reasons why a parent established a capital, a particular equity ratio as long as it's within an acceptable range. It could have been as a result of a loan. It could have been without a loan. If the excess cash just sat there in retained earnings, the commission wouldn't remove it. And I refer you to the Iroquois case, where they rejected an argument that Iroquois had $64 million in excess cash that it didn't distribute. If it distributed, the capital structure would have been lower. The commission said, well, based on Transco, which we just decided, we're not going to look at that anymore. With respect to 11.2B, counsel refers to, again, the two positions of the staff and the rate protector shippers that the ALJ and the commission relied on. The shipper position, which is the one I mentioned before, is just simply that there's existing discounted capacity. Again, the amount of total discounts exceed the amount of post-'95 capacity, and therefore there's discounted $90.95 capacity. It doesn't address $95 costs at all. It doesn't address whether there's a shift in the cost of $95 capacity. Same thing with staff's analysis. Staff, she says, use that the billing determinants in the case were lower than the presumption billing determinants. Well, the presumption billing determinants are a measure of the maximum rates under 11.2B, which is reflective of the cost of the $95 capacity. So staff's analysis is basically saying, look, we've got some billing determinants here, there's a discount adjustment, and there's some shift of costs through the discount adjustment, but there's never any analysis of whether that shift relates to the cost of $19.95 capacity in El Paso's current rates. Thank you. Thank you, counsel. Thank you, counsel. We'll move to the second part of the case. Yes. Chief Judge Schroeder-Boston, and may it please the Court. The commission's cost allocation decision was erroneous in three respects. I'd like to start this morning on the first and what I think is the most fundamental respect. The commission recognized recently in the fuel case that unless you can reasonably determine the distance of haul, there's no way to set a distance-based rate that is just and reasonable. That principle should have been dispositive in this case. Because of the articulated and integrated nature of this pipeline and the predominant use of displacement, no one disputes that it's impossible to know how far distance is actually flowing between a particular receipt point and a particular delivery point. And the ALJ held in this instance, it's untenable to set rates based on actual distance. So what El Paso did instead is it sought to use contract path-based distances as a proxy for cost causation. But that just added an additional layer of irrationality. The problem is that contract paths are simply a tool that El Paso uses to make sure that in the aggregate, it's got sufficient capacity to serve all of the firm contracts on the system. It wasn't developed as a cost causation tool and it's not a proxy for the fixed costs on the system that are actually used to reach any particular destination point. Now FERC offers three defenses of the uses of contract paths, and I'd like to address them in turn. Can I just ask you a conceptual question, which is you don't take issue with the basic understanding that seems to be underlying everybody's presentation of this, that just as a general matter, distance can relate to cost. Absolutely not, Your Honor. And the reason distance can relate to cost is if you have a straight-line system, for example, I think as we've explained in our brief, is if your gas flows further along that straight-line system, you're responsible for more of the fixed costs of the pipes that are built and have to be constructed along the course of that system. And that's really all we're talking about here. The problem with the contract paths, and again, FERC offers three defenses of them. The first defense they offer is that they approximate the actual costs. The problem with that is that the record cuts precisely in the other direction. First of all, one thing we know is that 20% of contract paths are literally impossible paths. Gas can't flow over those paths because those paths have segments in them called contraflow segments where gas actually flows in the opposite direction. Secondly, we know that even in addition to these impossible paths, as a practical matter, gas doesn't flow along many contract paths because of the use of displacement. As a result, the expert for El Paso, Mark Westhoff, acknowledged on page 742 and 743 of the JA that the most that he could say is that at times of peak usage, contract paths more nearly replicate actual gas flows. Not that they replicate, not that they're reasonable proxies, but that they come closer to it. And specifically, he put out a couple of data points. Closer than what? Closer than they do otherwise. That's all we know. Is that what they're representing? Yes. That's all they're saying is that at peak times, contract paths come closer to approximating actual paths than they do at non-peak times, which tells us precisely nothing. Now, he did have a couple of data points. So one of the data points he set out is that the most that he could say is that the crossovers, the north-south crossovers on this pipeline system, when they're at peak, contract paths replicate actual paths 60% to 70% of the time. But then he said as to the southern main line, it's a whole lot less clear, and it becomes a lot more confusing because of the use of displacement. So what we know is that even at the best of times, it is not a reasonable proxy, and for much of the pipeline, they can't even say that much. Now, FERC doesn't actually spend much time arguing before this court that there is a reasonable approximation. What it spends most of its time arguing is that in some other respect, it's a proxy for cost causation. And what they say specifically is that contract paths reflect the shipper's right to capacity along the specified path. But that's highly misleading. The only right that a shipper has is the right that's given by its firm contract, and that right is to nominate for receipt a particular quantity of gas at the receipt point and to take out that same quantity of gas from the delivery point. But the shipper has no right whatsoever to ship along a particular contract path, never has an enforceable right to do that. The paths weren't created for that purpose. They weren't created for purposes of cost causation whatsoever. As a result, there's no correlation then between a contract path, which doesn't describe how gas actually flows, and any articulable basis for allocating cost causation. The third basis that they argue is more of a throwaway, I think, which is they point out that different contract paths can be worth different amounts of money in the secondary market. Now, that's true, but it's irrelevant for this purpose. The reason that a contract path may be worth more in the secondary market than another contract path is that it may have segments along it that are in higher demand, choke points and things of that sort. It has nothing to do necessarily with how long the path is. And there's no evidence in this record, by the way, about what the different values of the contract paths that are at issue here are, much less anything in the record that would say that the differences in value in the secondary market correlate to the differences in the zone rates that El Paso has established. So that clearly isn't the basis. Perkov, there's nothing else. Can I ask this question? Even if it's true that sometimes the contract paths don't approximate the real world, sometimes some contract paths do. And so even what you pointed out was that you could have a 20% figure where it can't be used in that way, but then that would leave 80% where it can. 80% where it physically can, but not that no one has said that 80% of the time it actually does. And the reason, Your Honor, is this. Let's take another simple example. Not this case. But suppose you have a straight line going from here to here, and you've got a production area in the middle and a production area at the beginning. Gas can physically flow all the way, but gas may actually, it may make no sense for gas to flow all the way to the left-hand side here because it may be flowing from the middle because it's a lot more efficient to just enter the gas in the middle and go to the left. So for that reason, even when you physically can send gas along a particular contract path, the fact is that you may never, ever do so. And that's why, again, getting back to the only evidence we've got is their expert, Mark Westhoff. And, again, the most he would say is along two particular crossovers, 60% to 70% compliance at peak times. And for the rest of the system, he offered nothing. At the very least, substantial evidence, Your Honor, would require some more data that would give the court and give us reasonable assurance that this is a decent proxy, and there just isn't anything. And, by the way, 60% to 70% of the time is pretty poor to let start there because, after all, what they've calculated at the end of this process is a very small difference in mileage between California and Arizona. Now, if they're wrong 30% to 40% of the time, there's just no reasonable assurance that that difference in mileage is even correct. And, by the way, that points out another problem, another flaw in Firk's decision here, which is even if you assumed, which we, of course, don't, that contract pads work, at the very best, they're an awfully rough proxy. And yet, Firk disallowed El Paso, in this case, from equilibrating California and Arizona, which, after all, had a very small mileage difference between the two. Again, a rough proxy at best, and there were very real countervailing costs, fixed costs, that argued that deliveries to Arizona are more expensive. Those really very real fixed costs are discussed at pages 696 and 750 of the JA. 696 tells us that, in Arizona, a full 2,000 miles out of the 4,900 miles in the Arizona system are these small diameter laterals. You go to page 750, and what another of their experts, Mr. Westhoff, explains, is that these small diameter laterals carry only one-fifth the gas of the large pipelines, and yet they cost half as much to build. It doesn't take a whole lot of math to understand, therefore, that the unit fixed costs of the small diameter laterals are much higher. And that's 40% of the Arizona system. This data was all in the record, and all that El Paso did, and, of course, El Paso's allowed to establish whatever rates it wants in their zone of reasonableness, is that, look, we've got these very real offsetting costs. We have a very small mileage difference here, and it makes sense to treat them all as a single zone for rate purposes. Now, FERC refused to allow them to do so, but not for any reason that was rational. Now, first, FERC said, well, you don't have any empirical data to support that. There's a couple of problems with this. First of all, once you've accepted that zone-based pricing can be just and reasonable, you're in a world where you've already accepted averaging of longer and shorter distances within a particular zone. For example, Arizona is a large zone. They don't require that it be split up in five pieces. Here we're just talking about the California zone is literally the border of California and Arizona. The pipes are really, in Arizona, just one of the border. All El Paso said is small difference in miles. We've got offsetting costs. It makes sense. That's actually more empirical evidence than anyone introduced in this proceeding to justify use of state boundaries to begin with. So it's utterly irrational in a world where no one put in any evidence to justify why you'd use state boundaries. Actual evidence was introduced as to why to put California and Arizona together, and FERC said no. Makes no sense. Now, FERC said, well, equilibration's inconsistent with the contract path methodology. Of course it's not. Contract path methodology tells you how to try to estimate distances. It doesn't tell you what zones should look like, how big they should be, and what their boundaries should be. So that made no sense whatsoever. And as I've noted, to the extent that any empirical evidence was necessary, it was produced here. If there are no further questions, I would save the rest of my time for a bottle. Sure. Thank you. Thank you. Leah, Police Department. Lona Perry for the Commission. The Commission approved El Paso's proposal to use contract paths to allocate costs of the fixed installed capacity on the pipeline. Because they provided a reasonable proxy for the relative costs of service to each of the zones. And the Commission found that that was true because cost allocation for purposes of fixed costs has to do with service at peak. And the reason why the contract paths made sense is because the contract paths were created for the purpose of assuring that at peak, El Paso could serve all of the fixed shippers on the system. And therefore, the Commission found that using the contract paths as a mechanism for measuring the distance through the system required by the shippers in a zone was appropriate because that was for the purpose of accommodating peak capacity. And the thing that you need to bear in mind when you're considering this issue is, if you consider the map that's at page 740 of your joint appendix, the major operational limitation that exists on the El Paso system is the limited capacity of the crossovers that are on the west end of the system. Seventy percent of the contract volumes are being delivered to Arizona and California, but the crossover laterals between the north and south systems have very limited capacity. And the Commission's point was, and it discussed this about the route, the famous NS1 route, all the way around the Horn the other way to Arizona and to California. The point being that once these north-south laterals fill up, the rest of the service to those places has to go the other way, around the Horn. And therefore, when you're talking about peak, when you're talking about the need to make deliveries at peak, you need to take into account all of the costs of that system, not just what you might get in a direct line on an average or typical day. And the testimony that Mr. Bress was just referring to, the Westhoff testimony at JA 742, if you look at it, you will see there that he is referring to what happens when those north-south laterals at the west end of the system are at capacity. The rest of his conversation with Ms. Albert that he refers to is not on that page in the joint appendix, but what the discussion was about was he was saying you don't have to get to capacity on the main line before you start getting close to contract paths, before the contract paths start approximating the service. You just have to get at capacity on these west end laterals, and then they start to look more like the contract paths. And therefore, the commission found that there was substantial evidence to support the proposition that when you're considering the need for installed capacity at peak, that it was reasonable to consider the contract paths because those take into account all of the facilities that are needed to support those shippers, not just the ones on a typical day, but also the ones when they have to use the more circuitous route to make deliveries. So one way to look at it, I think, is that the contract path methodology is better than some alternatives because it does take into account paths at peak capacity for the reasons that you say. And then I guess the response would be, but it still has to be a reasonable proxy. Even if it's advantageous in one respect, it still has to be a reasonable proxy. And with respect to whether it's a reasonable proxy, what's your response to the point that we know that the contract path methodology includes paths that in the real world don't ever, in fact, exist? Well, Your Honor, I would point out that the contra paths, they exist in the pathing because there are four segments of this oval that are bidirectional. And it's not that they are physically impossible paths in the sense that the gas couldn't flow that way, but on parts of those laterals, there are predominant flows. And therefore, they treat those as contra flows because it's contrary to the predominant flow. It is actually a physical path. Right. No, I get that it actually exists in the laterals. And the commission recognized that the presence of these contra flows complicated the analysis, the mileage analysis. But the commission looked at their treatment, El Paso's treatment of those contra flow segments, which was to count them as zero miles, and decided that that was a reasonable way to deal with the presence of the contra flow segments. I mean, there's no issue that that was a complicating factor to the mileage analysis, but the commission decided that that was appropriate because they consume less forward haul capacity, obviously, because the deliveries would be made by displacement there, than do the forward haul parts of the system. And they decided that in taking into account the fact that the contra flows exist, that that was a reasonable method of dealing with that. To zero them out. Yes, to zero them out of the mileage. And so the commission found that with that treatment of the contra flows, that the contract path methodology was a reasonable proxy for the relative cost of serving each of the five state zones. And now, can you speak to equilibrium? Is that even a word outside of this context, actually? I don't even know. I've never heard of it. Not that I'm aware of, Your Honor. Yes, equilibration, or equilibration, I don't know. I'm not sure what the exact pronunciation would be. The commission's decision on equilibration was basically based on the fact that El Paso had gone to a great deal of effort to have this detailed decatherm mileage study that definitely showed a difference in mileage between California and Arizona. And then they proposed to change that methodology with respect to the western three zones, and to just average them out based on this alleged cost of Arizona laterals. There were a number of points about the Arizona laterals. First of all, the commission found that there was no empirical evidence whatsoever of the cost of the Arizona laterals. And Mr. Derryberry testified that there had been no quantification at all. They didn't keep track of the cost of the Arizona laterals. And so there was no calculation of the cost to offset the calculation of the mileage differences between the two zones. And there was no reason to think, there was no reason to decide that that should be an offsetting factor. And then the commission also found that even if you took into account just the idea that the argument that the per unit cost in Arizona was higher than it was in California because of the existence of these laterals, the commission found that that consideration, even though not quantified, was offset by other factors, which included the fact that there are discounted rates in California, and it also included the integrated operation of the pipeline itself. As the commission said at, well, they're discussing this in the context of equilibration at 528 paragraph 274, which is in the joint appendix of 106, and also at 528 paragraph 247, joint appendix 97, the commission discusses the fact that on an integrated system, you were assuming that all the customers benefit from the entire, all of the facilities of the entire system. And so the commission's view was that undercuts the argument that any particular zone is having a higher per unit cost of delivery than any other zone because the facilities are for the benefit of the entire system. And so with those things, the commission found that equilibration, that the equilibration of the zones as set out in the decatherm mileage study was not just unreasonable. And the commission also noted that at hearing, El Paso never made a case for the proposition that its decatherm mileage study without the subsequent step of equilibration would result in unjust and unreasonable rates. And the commission found that equilibration was in fact unjust and unreasonable, but the contract path methodology was reasonable. If there are any further questions? Thank you, counsel. Mr. Ress, how much time does Mr. Ress have in the rebuttal? I will move. Thank you. In order for contract paths to be a reasonable proxy for cost causation, whether it's through distance or some other method, you still need empirical proof that they are. Counsel discussed, you know, the fact that you have to use these crossovers when the system is at peak. I agree with that, of course, but it doesn't get them where they need to go. I'll use their example to show why it doesn't make a whole lot of sense. So NS1, everybody's familiar with that at this point. It's the very long roundabout route. We're not saying that at peak it is never used. There's evidence that at peak it might be used, seldomly if ever, but it might. The problem is this. The methodology they used has it taking up a full 20 percent of the gas shipments in terms of decatherm miles going from the San Juan Basin all the way to California. Now that changes, as we've described in our brief, that changes the overall mileage computations hugely. It increases the mileage from that receipt to that delivery point by 130 miles. If they're wrong on that, if it only is true 50 percent of the time, in other words, if it's a 10 percent rather than a 20 percent measure is the correct measure, suddenly California has fewer miles to get to it than Arizona does. And there's no evidence in the record from which the court can conclude that the contract path mileage basis is right in that instance or is wrong in that instance in terms of coming in at 20 percent. We believe it's wrong, but the whole point is there's no evidence that it's correct. So given that contract paths have not been shown to be accurate, those kind of assumptions can make a huge difference in the mileages that come out the other end of the calculation and therefore the rates that we have to pay. The mere fact that they use contract path methodology as an aggregate to make sure that as a whole the system doesn't sell more capacity than they can take on doesn't tell you that the relativities within the system work. There's absolutely nothing in the record that actually shows how they came up with their contract path based design, who got what paths, et cetera. There's nothing to show. And all we know is that each path is as short as the distance of each path was computed to be as short as that path could be. We have no proof that the average distance is anywhere as short as they could be. Number two, contra paths, there's no question that they're impossible in the sense that gas never flows that way. That's JA 609 and 833. Zeroing them out doesn't cure the problem because the problem is it's actually a false path. The whole path's wrong. So zeroing out one segment of it, you're still going along a path that in real life gas doesn't travel. As far as equilibration, the fact that they spent a great deal of time computing the overall mileage really tells us nothing because that doesn't tell us what shape zones are right, what size zones are right, or where their boundaries should be. It just tells us what the overall miles are. Secondly, the cost for Arizona laterals. What we know is that they're real costs. Yes, we don't know exactly how much they were, but they didn't know exactly how much the additional cost of small laterals were in the Tennessee gas case either. If I may, I'll just finish up with this last point, Your Honor. As to the offsetting factors that FERC discussed, the integrated nature of the pipeline actually counts in favor of equilibration, not arguing against equilibration. And to the extent they're trying to argue that the laterals that are in Arizona are used by other parts of the system, the evidence in this case, and again this is at page 696, is that those 2,000 miles of laterals are used only for Arizona deliveries. So they're not integrated with anything else whatsoever. The discounts to California, again, don't matter because what we're looking at here is the maximum rates that El Paso is allowed to charge. Whether in real life under certain market conditions it provides discounts have nothing to do with the question that this court is looking at, which is whether they've sent the maximum rates at a lawful level. Thank you. Thank you very much. Thank you, counsel. The case is submitted.
judges: Srinivasan, Garland, Wilkins